**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 24-cv-3375** |
| **APPROXIMATELY 2210.8222 SOL CRYPTOCURRENCY,** | |
| **Defendant.** | |

**<u>VERIFIED AMENDED COMPLAINT FOR FORFEITURE *IN REM*</u>**

Plaintiff, the United States of America, through the U.S. Attorney for the District of Columbia, brings this verified complaint for forfeiture in a civil action *in rem* against approximately 2204.7622[1] Solana ("SOL"), a type of cryptocurrency, hereinafter the "Defendant Property," and alleges as follows:

**<u>JURISDICTION AND VENUE</u>**

1. This Court has original jurisdiction of this civil action by virtue of 28 U.S.C. § 1345, because it has been commenced by the United States, and by virtue of 28 U.S.C. § 1355(a), because it is an action for the recovery and enforcement of a forfeiture under an Act of Congress.

2. Venue is proper here under 28 U.S.C. § 1395(a).

---

[1] The case caption indicates that approximately 2210.8222 SOL are involved in this matter. However, as explained below, when the approximately 2210.8222 SOL were transferred to the U.S. Marshals Service, that transfer incurred various fees for service. As a result of those fees, the U.S. government received approximately 2204.7622 SOL, instead of the approximately 2210.8222 SOL referenced in the caption. The Defendant Property is therefore approximately 2204.7622 SOL.

## **STATUTORY AUTHORITY**

3.    Offense Statutes. This investigation relates to violations of 18 U.S.C. § 1030 (Computer fraud and abuse), 18 U.S.C. § (Wire fraud), 18 U.S.C. § 1956 (Money laundering), and conspiracy to commit the foregoing offenses in violation of 18 U.S.C. §§ 371, 1349, and 1956(h).

4.    **Computer fraud and abuse:** 18 U.S.C. § 1030(a)(5) makes it a crime, *inter alia*, to knowingly cause the transmission of a program, information, code, or command, and as a result of such conduct, to intentionally cause "damage without authorization," to a "protected computer." The term "protected computer" is defined in 18 U.S.C. § 1030(e)(2) and includes, *inter alia*, a computer used in or affecting interstate or foreign commerce or communication, including a computer located outside the United States that is used in a manner that affects interstate or foreign commerce or communication of the United States. *See Van Buren v. United States*, 141 S. Ct. 1648, 1652 (2021) (definition of protected computer under 18 U.S.C. § 1030(e)(2)(B) includes "at a minimum . . . all computers that connect to the Internet").

5.    As explained below, this case involves North Korean cyber actors hacking into victim networks online and conducting unauthorized withdrawals of virtual currency. These transactions caused "damage without authorization" to "protected computers"—namely, nodes (*i.e.*, computers) running as part of the Solana blockchain. *See* 18 U.S.C. §§ 1030(a)(5)(A) and (e)(2)(B). More specifically, the Solana blockchain's data was damaged, without authorization, when the North Korean actors initiated transactions that caused Solana's data to reflect these unauthorized transfers. Solana operates via a web of interconnected computers all around the world, including in Washington, D.C. Those nodes in Washington, D.C. are the protected computers in this case.

6.    **Conspiracy:** 18 U.S.C. § 371 prohibits a conspiracy to commit an offense or to defraud the United States, including a violation of 18 U.S.C. § 1030.

7.     **Wire fraud:** 18 U.S.C. § 1343 makes it a crime for anyone, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, to transmit or cause to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice. 18 U.S.C. § 1349 prohibits the attempt or conspiracy of a violation of 18 U.S.C. § 1343.

8.     **Money laundering:** 18 U.S.C. § 1956(a)(1)(A)(i) makes it a crime to conduct or attempt to conduct a financial transaction, knowing that the property involved in the transaction represents the proceeds of some form of unlawful activity, and which in fact involves the proceeds of specified unlawful activity, with the intent to promote the carrying on of specified unlawful activity. This offense is sometimes referred to as promotional money laundering. 18 U.S.C. § 1956(a)(1)(B)(i) makes it a crime to conduct or attempt to conduct a financial transaction, knowing that the property involved in the transaction represents the proceeds of some form of unlawful activity, and which in fact involves the proceeds of specified unlawful activity, knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity. This offense is sometimes referred to as concealment money laundering.

9.     The term "specified unlawful activity" is defined in 18 U.S.C. §§ 1956(c)(7) and 1961(1), and it includes violations of 18 U.S.C. § 1030 (Computer fraud and abuse) and 18 U.S.C. § 1343 (Wire fraud).

10.     18 U.S.C. § 1956(h) criminalizes a conspiracy to violate § 1956.

11.     18 U.S.C. § 1956(f) provides, in pertinent part, that federal courts in the U.S. have extraterritorial jurisdiction over the conduct prohibited by Section 1956 if: (1) the conduct is by a

non-United States citizen and the conduct occurs in part in the United States; and (2) the transaction or series of related transactions involves funds or monetary instruments of a value exceeding $10,000.

12.     As explained below, in the instant case, the facts establish that the conduct was by non-United States citizens (*i.e.*, North Korean cyber actors) whose actions occurred, in part, in the United States. More specifically, those non-United States citizens used U.S.-based online infrastructure to engage in unauthorized hacking. The non-United States citizens then stole funds from a victim's cryptocurrency wallet and conducted unauthorized transfers of the stolen funds in excess of $10,000. The theft took place on the Solana blockchain, which is run by Solana Labs in the U.S. The Solana network has nodes (*i.e.*, computers) running the network in, among other places, Washington, D.C.

13.     Forfeiture Statutes. Pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from "proceeds" traceable to a violation of 18 U.S.C. § 1030 (Computer fraud and abuse), 18 U.S.C. § 1343 (Wire fraud), or a conspiracy to commit such an offense, is subject to criminal and civil forfeiture.

14.     Pursuant to 18 U.S.C. § 981(a)(1)(A), any property, real or personal, "involved in" a transaction or attempted transaction in violation of 18 U.S.C. § 1956 (Money laundering) is subject to criminal and civil forfeiture. Forfeiture pursuant to these statutes applies to more than just the proceeds of the crime. These forfeitures encompass all property "involved in" the crime or the attempted crime, which can include "clean" or "legitimate" money that is commingled with "tainted" money derived from illicit sources. This commingling is a laundering technique that facilitates the scheme because it obfuscates the trail of the illicit funds. *See,* e.g., *United States v. Huber*, 404 F.3d 1047, 1058 (8th Cir. 2005) (the presence of legitimate

funds does not make a money laundering transaction lawful; it is only necessary to show that the transaction involves criminal proceeds).

15.     18 U.S.C. § 981(b) states that property subject to forfeiture under Section 981 may be seized via a civil seizure warrant issued by a judicial officer "in any district in which a forfeiture action against the property may be filed," and may be executed "in any district in which the property is found," if there is probable cause to believe the property is subject to forfeiture. 18 U.S.C. § 982(b)(l) incorporates the procedures in 21 U.S.C. § 853 (other than subsection (d)) for all stages of a criminal forfeiture proceeding. Section 853 permits the government to request the issuance of a seizure warrant for property subject to criminal forfeiture, which is what occurred in this case.

## DEFININTIONS AND BACKGROUND

### Background Related to Virtual Currency

16.     **Virtual Currency:** Virtual currencies are digital tokens of value circulated over the Internet. Virtual currencies are typically not issued by any government or bank like traditional fiat currencies, such as the U.S. dollar, but rather are generated and controlled through computer software. Different virtual currencies are currently in circulation. Bitcoin (or BTC) and ether (ETH) are currently the most well-known virtual currencies in use. BTC exists on the Bitcoin blockchain, and ETH exists on the Ethereum network.

17.     **Virtual Currency Address:** Virtual currency addresses are the virtual locations to which such currencies are sent and received. A virtual currency address is analogous to a bank account number and is represented as a string of letters and numbers.

18.     **Private Keys:** Each virtual currency address is controlled using a unique corresponding private key, a cryptographic equivalent of a password, which is needed to access

the address. Only the holder of an address's private key can authorize a transfer of virtual currency from that address to another address.

19.    **Virtual Currency Wallet:** There are various types of virtual currency wallets, including software wallets, hardware wallets, and paper wallets. The virtual currency wallets at issue for the purposes of this affidavit are software wallets (i.e., a software application that interfaces with the virtual currency's specific blockchain and generates and stores a user's addresses and private keys). A virtual currency wallet allows users to store, send, and receive virtual currencies. A virtual currency wallet can hold many virtual currency addresses at the same time.

20.    Wallets that are hosted by third parties (e.g., by virtual currency exchanges) are referred to as "hosted wallets" because the third party retains a customer's funds until the customer is ready to transact with those funds. Conversely, wallets that allow users to exercise total, independent control over their funds are often called "unhosted" wallets.

21.    **Blockchain:** Many virtual currencies publicly record all of their transactions on what is known as a blockchain. A blockchain is essentially a distributed public ledger, run by the decentralized network of computers, containing an immutable and historical record of every transaction utilizing that blockchain's technology. The blockchain can be updated multiple times per hour and records every virtual currency address that has ever received that virtual currency and maintains records of every transaction and all the known balances for each virtual currency address. There are different blockchains for different types of virtual currencies. Solana is the main blockchain platform at issue in this case. As with other blockchains, using Solana incurs transaction fees. Solana is managed by a U.S.-based company, Solana Labs. The relevant transactions described below all took place on the Solana blockchain.

22.    **Blockchain Explorer:** These explorers are online tools that operate as a blockchain search engine, allowing users the ability to search for and review transactional data for any addresses on a particular blockchain. A blockchain explorer is software that uses application programming interface (API) and blockchain nodes to draw data from a blockchain and uses a database to arrange and present the data to a user in a searchable format. An API is a set of definitions and protocols for building and integrating application software.

23.    **Virtual Currency Exchange (or VCEs):** VCEs are trading and/or storage platforms for virtual currencies (*e.g.*, BTC and ETH). Many VCEs store their customers' virtual currency in virtual currency wallets. As previously stated, these wallets can hold multiple virtual currency addresses associated with a user on a VCE's network. Because VCEs act as money services businesses, they are legally required to conduct due diligence of their customers (*i.e.*, KYC checks) and to have anti-money laundering programs in place (to the extent they operate and service customers in the United States). As explained below, WhiteBIT is the main VCE involved in this case.

24.    **Blockchain Analysis:** As previously stated, while the identity of a virtual currency address owner is generally anonymous, law enforcement can identify the owner of a particular virtual currency address by analyzing the blockchain (*e.g.*, the Bitcoin blockchain). The analysis can also reveal additional addresses controlled by the same individual or entity. "For example, when an organization creates multiple [BTC] addresses, it will often combine its [BTC] addresses into a separate, central [BTC] address (*i.e.*, a "cluster"). It is possible to identify a 'cluster' of [BTC] addresses held by one organization by analyzing the [BTC] blockchain's transaction history. Open source tools and private software products can be used to analyze a transaction." *United States v. Gratkowski*, 964 F.3d 307, 309 (5th Cir. 2020).

25.     In addition to using publicly available blockchain explorers, law enforcement uses commercial services offered by several different blockchain-analysis companies to investigate virtual currency transactions. These companies analyze virtual currency blockchains and attempt to identify the individuals or groups involved in transactions. Through numerous unrelated investigations, law enforcement has found the information provided by these tools to be reliable.

**Background Regarding FBI's Lazarus Group Investigation**

26.     The FBI is investigating virtual currency hacks perpetrated by members of a North Korean military hacking group known within the cybersecurity community as the Lazarus Group or APT38.[2] The FBI assesses that Lazarus Group/APT38 actors are responsible for these hacks based on, among other things, distinctive tactics, techniques, and procedures observed in virtual currency heists linked to North Korea. Since at least late 2014, these subjects have engaged in cyber-attacks, intrusions, and attempted intrusions into computers and networks of, among others, U.S. and foreign entertainment companies, U.S. and foreign banks, U.S. cleared defense contractors and energy companies, virtual currency exchanges, information security researchers, and pharmaceutical companies. Lazarus Group/APT38 actors have exhibited a particular focus on leveraging their malicious cyber activity to steal money and virtual currency from their victims. From at least 2017 through 2025, these actors continued this targeting (including of U.S.-based companies) and successfully conducted multiple virtual currency heists from virtual asset service providers and other victims, netting hundreds of millions of dollars of virtual currency. All of these

---

[2] APT is an acronym for "Advanced Persistent Threat" and is used to define and identify groups of organized, highly skilled, and well-resourced cyber actors who maintain focused efforts on specific tasks such as intelligence gathering against specific business sectors or governments. APTs are known to gain access to computer networks while remaining undetected for extended periods. APTs are often nation-state or state-sponsored groups. Upon identification, the group is assigned a unique number as an identifier by the community: in this case, APT38.

heists are part of a conspiracy to gain unauthorized access to victim networks, steal funds, and then launder those funds to support the North Korean government.

27.     To effectuate some of their hacking activity, Lazarus Group actors conduct social-engineering campaigns, frequently via LinkedIn (a U.S.-based company), to compromise employees at virtual currency- related companies. These actors use multiple personas and purport to be recruiters from well-known companies within the industry. After some high-level business discussions and rapport building, the actors will request that the victims continue the discussion through other communication methods, such as WhatsApp, Telegram, and/or Slack. As a part of the interview, the victims are convinced to execute a project from a GitHub repository that is malicious in nature. (GitHub is a U.S.-based company.) In other words, the victims are convinced to download malware onto their computer without knowing it.

28.     Once the victims (*i.e.*, the unwitting employees being targeted by the North Koreans) are compromised, the North Korean actors try to obtain the victim's work credentials. Those credentials allow the North Koreans to gain unauthorized access to the employer's network. Within the employer's network, the North Koreans search for the private keys needed to steal the employer's virtual currency. The FBI refers to this particular type of Lazarus Group activity as "TraderTraitor."

### Background Regarding the Rain.com Theft

29.     Rain Management W.L.L., also known as Rain.com, is licensed by the Central Bank of Bahrain as a "Crypto-Asset Services Provider." As a Crypto-Asset Service Provider, Rain.com offers its customers the ability to swap between different currencies, purchase or sell virtual currency, manage customers' portfolios, and assist with investment decisions. Rain Management is headquartered in the Kingdom of Bahrain.

30.    On or about April 29, 2024, Rain.com was targeted by North Koreans Lazarus Group/APT38 actors using TraderTraitor malware. That targeting resulted in a financial loss to Rain.com of approximately $16.13 million (valued at the time of relevant transfers), including approximately $760,997.68 in SOL (valued at the time of relevant transfers). As described in more detail below, of the $16.13 million stolen, the FBI was able to successfully freeze approximately 2210.8222 SOL at WhiteBIT, a virtual currency exchange headquartered in Vilnius, Vlinias Apskritis, Lithuania.

31.    The FBI served WhiteBIT with a seizure warrant for the funds (authorized under DDC case number 24-sz-40). WhiteBIT then transferred the funds to the U.S. government, and those funds are currently located in the United States under the control of the U.S. Marshals Service.

**Rain.com's Response to the Theft**

32.    In sum, Rain.com conducted an internal investigation. That investigation revealed that the actors gained unauthorized access to Rain.com's virtual currency using one of North Korea's signature malware strains, TraderTraitor. According to Rain.com, the infiltration only enabled the exploitation of the Rain.com "send" wallets. A "send" wallet refers to the "hot wallet" Rain used to send money to customers. A hot wallet is a key storage method for any private key that is connected either directly to the internet or through another device.

33.    After the theft, Rain.com hired U.S.-based Mandiant Inc. ("Mandiant") to investigate the cybersecurity breach. When conducting their investigation, Mandiant learned that a Rain.com employee's device ("Employee 1") had been compromised. Specifically, based on the investigation, law enforcement learned that North Korean cyber actors contacted Employee 1 on LinkedIn (a social networking platform run by a U.S.-based company) and asked if Employee 1 was interested in a new job. Employee 1 indicated that Employee 1 was interested, so the North

Korean cyber actors sent Employee 1 a malicious link disguised as a coding challenge. When Employee 1 unwittingly downloaded the coding challenge, Employee 1's device was compromised with malware. Employee 1 was unaware that this happened and did not authorize the compromise.

34.    This malware allowed the North Korean actors to steal private keys and credentials that ultimately gave the actors access to Rain.com's online infrastructure. Rain.com's online infrastructure was managed by the U.S.-based company BitGo. Rain.com used BitGo to interact with and manage Rain.com's virtual currency assets, meaning that the North Korean actors got access to Rain.com's network by obtaining credentials for an account managed by a U.S. company and accessing, without authorization, U.S. accounts. After the foothold was established via Employee 1's compromised device, the North Korean actors stole virtual currency from Rain.com's send wallet and deleted the malware from Employee 1's device.

35.    Below are some of the accounts and credentials used by the North Koreans to conduct the unauthorized intrusion and theft from Rain.com. The companies listed below are all U.S.-based.

    i.  Domain: toptal.com; Company: Dreamhost LLC
   ii.  Domain: gufum.com; Company: Cloudflare
  iii.  Username: croakacolame@gmail.com; Company: Google
  iv.  Username: tarek-esmail; Company: LinkedIn
   v.  Domains: dxice.com, vogco.com; Company: NameSilo LLC

36.    The funds that are the subject of this action were traced from Rain.com's wallets to WhiteBIT, where they were frozen pending seizure, and then transferred to the U.S. government.

37.    Below is a graph—created by the FBI—of transactions the FBI traced and determined were involved in the theft. They include, among others, deposits of stolen funds at the WhiteBIT exchange:



**Details Regarding Tracing the Stolen Funds to WhiteBIT**

38.    FBI investigators traced a total of eight transactions involving funds stolen from Rain.com's send wallet to an address controlled by the North Korean cyber actors and/or their money laundering co-conspirators, "**DrkSpv…RQom**." Beginning on or about April 29, 2024, at 01:54 GMT, and continuing through 03:42 GMT, through these eight transactions, the actors stole approximately 5,505.904159384 SOL, which was valued at approximately $760,997.68 on the date of the theft (*i.e.*, over $10,000)

39.    Of the 5,505.904159384 SOL sent to address "**DrkSpv…RQom**," approximately 4,890 SOL was sent in seven transactions to seven different addresses at WhiteBIT. Of the 4,890 SOL, approximately 2,211 SOL was sent in two transactions of approximately 1,500 SOL and approximately 710.753138909 SOL from "**DrkSpv…RQom**" to WhiteBIT. Approximately 1,500 SOL was sent to WhiteBIT deposit address "**JDZvMk…SB1K7**," and approximately 710.753138909 SOL was sent to WhiteBIT deposit address "**EJe7Ca…Pb6nf**.

40.     On or about May 7, 2024, WhiteBIT's Anti-Money Laundering and Financial Monitoring Departments suspended approximately 2210.8222 SOL and eventually consolidated the SOL into WhiteBIT deposit address **8mowmVCEewZ9W2cEaQyQeQEeSxhGr1hvRviLwozwNtBt**. Thereafter, the FBI obtained a seizure warrant for the approximately 2210.8222 SOL and served it on WhiteBIT. When WhiteBIT transferred the approximately 2210.8222 SOL to the U.S. government, that transfer incurred various fees for service.  As a result of those fees, the U.S. government received approximately 2204.7622 SOL. The Defendant Property is therefore approximately 2204.7622 SOL. As previously stated, the approximately 2204.7622 SOL is currently in the custody of the U.S. Marshals Service.

41.     As part of this scheme, North Korean cyber actors typically launder stolen funds through virtual currency exchanges, swapping currencies or value to different blockchains, to make following those assets more difficult and to prevent stolen funds from being frozen by law enforcement. What happened here is no different: Lazarus Group/APT38 actors transferred the stolen virtual currency to WhiteBIT to launder the virtual currency and obfuscate the nature, source, location, ownership, or control of stolen funds.

42.     All of the relevant transactions described above took place on the Solana blockchain. As explained above, Solana is run by Solana Labs, a U.S.-based company. At the time of those transactions, computer nodes (*e.g.,* "validator nodes" that validate transactions on the Solana blockchain and "remote procedure call nodes" that act as access points between Solana and its users so that users can access Solana) were located around the world, including in the District of Columbia.

## COUNT ONE – FORFEITURE OF DEFENDANT PROPERTY

### (18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

43.     Paragraphs 1 through 42 are realleged and incorporated by reference herein.

44.     The Defendant Property are property constituting or derived from proceeds traceable to computer fraud, wire fraud, and conspiracy to commit wire fraud and computer fraud, in violation of 18 U.S.C. §§ 1030, 1343, 1349, and 371.

45.     Accordingly, the Defendant Property is subject to forfeiture in the United States under 18 U.S.C. § 981(a)(1)(C).

## COUNT TWO – FORFEITURE OF DEFENDANT PROPERTY

### (18 U.S.C. § 981(a)(1)(A))

46.     Paragraphs 1 through 42 are realleged and incorporated by reference herein.

47.     The Defendant Property are property involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i), 1956(a)(2)(B)(i), and 1956(h), that is, a conspiracy to conduct or attempt to conduct financial transactions involving the proceeds of specified unlawful activity, to wit, computer fraud, wire fraud, and conspiracy to commit wire fraud and computer fraud, knowing that the transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity.

48.     Accordingly, the Defendant Property are subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(A).

### PRAYER FOR RELIEF

WHEREFORE, the United States of America prays that notice issue on the Defendant Property as described above; that due notice be given to all parties to appear and show cause why

the forfeiture should not be decreed; that this Honorable Court issue a warrant of arrest *in rem* according to law; that judgment be entered declaring that the Defendant Property be forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other relief as this Court may deem just and proper.

January 23, 2026
Washington, D.C.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney for the
District of Columbia

By: */s/ Jessica C. Peck*
N.Y. Bar No. 5188248
Trial Attorney
U.S. Department of Justice
Criminal Division
Computer Crime and Intellectual Property Section
1301 New York Avenue, N.W.
Suite 600 Washington, D.C. 20005
(202) 514-1026 (main line)

*/s/ Gregory Jon Nicosia, Jr.*
GREGORY JON NICOSIA, JR.
D.C. Bar No. 1033923
Trial Attorney
National Security Cyber Section
National Security Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530
Telephone: 202-353-4273

*/s/ Rick Blaylock, Jr.*
RICK BLAYLOCK, JR.
TX Bar No. 24103294
Assistant United States Attorney
Asset Forfeiture Coordinator
United States Attorney's Office
601 D Street, N.W.
Washington, D.C. 20001
(202) 252-6765

## VERIFICATION

I, Colleen McGovern, a Special Agent with the Federal Bureau of Investigation, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Amended Verified Complaint for Forfeiture *in rem* is based upon reports and information known to me and/or furnished to me by other law enforcement representatives and that everything represented herein is true and correct.

Colleen McGovern
Special Agent
Federal Bureau of Investigation